JOSEPH A. RHEINBERGER, ADMINISTRATOR c.t.a. OF ESTATE OF MABEL BYRNES ADAMS, v. THE FIRST NATIONAL BANK OF ST. PAUL.

150 N. W. (2d) 37.

March 17, 1967—No. 40,109.

*Gerald H. Hanratty* and *Harry H. Peterson,* for appellant.

*Oppenheimer, Hodgson, Brown, Wolff & Leach, David C. Donnelly,* and *Richard H. Murray,* for respondent.

ROGOSHESKE, JUSTICE.

The question presented on this appeal concerns the liability of a bank for failing to prevent a fiduciary from converting his principal's funds on deposit with the bank.

Apart from the issue as to whether the fiduciary forged the power of attorney given to him by his mother, the evidence is not conflicting and established these undisputed facts relevant to the issue of the bank's liability. Decedent, Mrs. Mabel Adams, and her husband, Edward C. Adams, Sr., were the parents of one child, Edward B. Adams, Jr. Mr. Adams, Sr., during his lifetime had been the head of the legal department of the Internal Revenue Service in St. Paul and, upon his retirement in about 1955, became associated with James McCollister in the private practice of law until his death in September 1959. Mrs. Adams died on October 22, 1960. Their son, who was then about 40 years of age, is the father of three children by his first marriage and prior to his mother's death was living with his second wife, whom he married in 1957 and who divorced him in 1962 subsequent to his mother's death. He now resides in Tacoma, Washington. For some time while both parents were living, they maintained a joint checking account in defendant bank. Both were personally known by Carl Peterson, then an assistant vice president, who also was aware of Mr. Adams, Sr.'s association with

Mr. McCollister. Following Mr. Adams, Sr.'s death, Mrs. Adams visited Mr. Peterson in October 1959 and transferred the joint account into her name alone.

Shortly before September 8, 1960, Adams, Jr., telephoned Peterson to request a form by which his mother could give him power of attorney to withdraw funds from her account. He explained that his mother had just undergone surgery and that she desired to empower him to pay her bills. The bank furnished a power-of-attorney form used by it for at least 13 years, which, by its terms, granted unlimited authority to withdraw funds. The power of attorney in the form provided, dated September 8, 1960, was signed by Mrs. Adams and her son and returned to the bank.[1] At this point of time, Peterson knew Adams, Jr., was an only child and he was casually acquainted with him, but he had no knowledge of the existence of any family friction between the mother and the son nor of the contents of Mrs. Adams' will, which, as revealed after her death, disinherited her son in favor of his three children. On September 8, 1960, Mrs. Adams had on deposit $14,485.54. She was known to be ill with cancer.

No special attention was requested concerning the account until a telephone call from Adams, Jr., to Peterson on October 15, 1960. Since Adams, Jr., did not appear at trial, his former wife and Peterson related the substance of the telephone conversation as follows:

---

[1] The power of attorney so executed is as follows:

"Title of account                                "Power of Attorney
"Mrs. Mabel B. Adams             "Account Number 8-011-2
        "THE FIRST NATIONAL BANK OF SAINT PAUL, MINN.

"Below is the signature of Edward B. Adams who is authorized to sign and/or endorse checks and drafts, either for deposit or for the withdrawal of funds, with The First National Bank of Saint Paul in my name. This power of attorney shall be binding upon me, my heirs, legal representatives and assigns, until the First National Bank of St. Paul shall receive written notice of revocation thereof from me, or in the event of my death, disability or any other cause of revocation until said bank shall receive notice thereof.

"/s/ Mabel B. Adams

"By /s/ Edward B. Adams
"Address 627 No. Lexington Pkwy — St. Paul 4 Minn."

"Well, Ed said, 'Carl, my mother is in the cancer home and I was informed today that she is dying. I want — I am the only heir, and I want the money transferred from her account to my checking account.' He said that in the event of her death the Power of Attorney would be meaningless, a useless instrument, and he wouldn't be able to write checks, and then * * * Ed said, 'Well, if she should die over the weekend, and the estate goes into probate, the money would be tied up, and I won't be able to write checks.' [Mr. Adams said] that he had visited with his attorney, Mr. McCollister, and Mr. McCollister had suggested that he transfer this account into his name as trustee for Mabel Adams."

Peterson stated that the transfer could not be made on Saturday, advising Adams, Jr., to come into the bank the following Monday. On Monday, October 17, Adams, Jr., visited the bank and, assisted by Robert Higgins, another bank officer, had the $13,333.17 balance of his mother's estate transferred to an account entitled "Edward B. Adams as trustee for Mabel B. Adams." Before effecting this transfer, Higgins telephoned the cancer home and was informed that Mrs. Adams was then alive and of sound mind. The transfer was made by debiting Mrs. Adams' account and crediting the funds on deposit to the new account.

On November 3, 1960, after the death of his mother, Adams, Jr., had Higgins transfer the trust account into his name alone. In April 1961, Mrs. Adams' estate commenced an action against Adams, Jr., to recover the funds transferred to the trust account on October 17, 1960. It secured a default judgment but was able to recover only $5,428.54, leaving a loss of $7,904.63, for the recovery of which the estate commenced this action in October 1962 against the bank. There is no evidence, indeed no suggestion, that the bank derived any benefit from the transaction.

The action under review is based upon two separate causes of action: (1) That the bank in permitting the transfer on October 17, 1960, did so with knowledge that Adams, Jr., was thereby committing a breach of his fiduciary obligations and, with knowledge of such facts, that its action in making the transfer was done in bad faith; and (2) that the bank wrongfully and negligently allowed Adams, Jr., to withdraw funds from his mother's account by using a forged power of attorney. The court

submitted only the second cause of action to the jury. The jury found the power of attorney to be genuine. The first cause of action was reserved for determination by the court over the estate's objection. The court found for the bank.

The estate contends that Minn. St. 520.09 of the Uniform Fiduciaries Act has no application to the issue of the bank's liability for effecting the transfer of funds on October 17, 1960, because the transfer was made by the use of credits and debits rather than a check. The estate argues that the common law governs the determination of this issue. We cannot agree.[2]

Minn. St. 520.09 provides:

"If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, *or if he otherwise makes a deposit of funds held by him as fiduciary*, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith." (Italics supplied.)

In our opinion the transfer of funds by debiting the old account and crediting the new account falls within the scope of the italicized language

---

[2] While the estate argues that the common law governs, it is our opinion that the rule as to the bank's liability would be the same under the common law as applied by this court as under Minn. St. 520.09 of the Uniform Fiduciaries Act. Western Surety Co. v. Farmers & Merchants State Bank, 241 Minn. 381, 63 N. W. (2d) 377; Rodgers v. Bankers Nat. Bank, 179 Minn. 197, 229 N. W. 90.

of the act.[3] Under this provision the bank is not liable for making the transfer of funds from one account to the other unless the transfer was made with knowledge that Adams, Jr., was thereby committing a breach of his fiduciary obligations or with knowledge of facts which indicate the bank was acting in bad faith in making the transfer. "Bad faith" does not exist if the bank was acting honestly, § 520.01, subd. 6.

We hold that the relevant facts are not sufficient to establish that the bank had actual knowledge that Adams, Jr., was committing a breach of his fiduciary obligations by securing the transfer to a trust account. This conclusion necessarily follows from our agreement with the court's conclusion that the power of attorney issued to Adams, Jr., gave him authority to effect this transfer.

The power of attorney on its face gave Adams, Jr., an unlimited authority to write checks withdrawing funds from his mother's account. Its terms contained no limitations either as to the amount of money which could be withdrawn or as to the purposes for which such money had to be used. Peterson did know as a result of his conversation with Adams, Jr., that Mrs. Adams desired to execute a power of attorney because she was seriously ill and wanted her son to pay her bills for her. The nature and extent of the authority granted by a power of attorney must be determined primarily by a consideration of the actual language used in the instrument. Duluth News Tribune v. Smith, 169 Minn. 356, 211 N. W. 322. Where, as here, the language used is not ambiguous, its literal scope cannot be restricted by parol evidence as to the reasons the maker of the power of attorney had for executing it. 3 Am. Jur. (2d) Agency, §§ 28, 33. We must conclude that the son's authority was not limited solely to writing checks to pay his mother's bills.

---

[3] This holding is not inconsistent with the decision in Colby v. Riggs Nat. Bank, 67 App. D. C. 259, 92 F. (2d) 183, where the court held this section was inapplicable because the deposit in question served to wipe out an overdraft in the account to which it was made. In this case the deposit had no such effect. Moreover, the court's language as to the inapplicability of the Uniform Fiduciaries Act to mere bookkeeping transactions accomplished by debits and credits referred to § 6 of the act, not § 9. Section 6 contains no language comparable to the italicized portion of § 9, upon which we rely.

Granted that Adams, Jr., had the authority to secure the transfer by writing checks on the old account and thereupon depositing withdrawals in such form in the new account, did he nonetheless exceed his authority because he accomplished this same result by the bank's debiting the old account and crediting the new one? We think not. We recognize that where the mode of exercising a power is prescribed in the instrument, strict compliance in every substantial particular is required. Rice v. Tavernier, 8 Minn. 214 (248). In this instance, however, the variance is merely one of form rather than substance. In our view, the power to withdraw funds by check included the implied power to accomplish the same result by means of the procedure used.

We also conclude that the bank was not aware of any facts which would support a finding that it was acting in bad faith in making the transfer. The bank gained no benefit whatsoever from the transfer either directly or indirectly. Assuming that when Adams, Jr., secured the transfer to the trust account he did so for the wrongful purpose of converting the funds to his use, nonetheless the bank at that time was not aware of any facts or circumstances which would put it on notice of his future misuse of the transferred funds.

The fact of the transfer did not of itself serve to put the bank on notice of the son's intended breach of his fiduciary obligation. The mere fact a fiduciary deposits in his personal bank account funds known by the bank to be fiduciary funds does not put the bank on notice that the fiduciary intends to misappropriate such funds. Western Surety Co. v. Farmers & Merchants State Bank, 241 Minn. 381, 63 N. W. (2d) 377; Rodgers v. Bankers Nat. Bank, 179 Minn. 197, 229 N. W. 90. The nature of the deposit made by Adams, Jr., was surely less suspicious than the deposits considered in the cases cited. Since he was known to have an unlimited power of attorney to write checks on Mrs. Adams' account and the transfer was made to an account in trust for his mother, not to his personal account, his actions were ostensibly proper.

Moreover, the circumstances surrounding the transfer were not such as to put the bank on notice that the son would eventually misuse the transferred funds. The information possessed by the bank at the time of the transfer included the following: Adams, Jr., was a mature man of

about 40 years of age with a good reputation in the community. His mother had been ill with terminal cancer for some time. He was her only child and apparently had a harmonious relationship with her. She apparently had great faith in him. She decided to have him pay her bills while she was ill. To accomplish this purpose, she executed a power of attorney giving him unlimited authority to draw checks on her account with the bank. During the approximately 5 weeks this power had been in existence her account's balance had decreased by about a thousand dollars, with no difficulties having developed.

The reasons given for wanting to make the transfer at that time were plausible. It is not extraordinary for a person to attempt to free certain funds from probate procedures so that hospital and funeral expenses can be promptly paid. Moreover, Adams, Jr.'s request was made pursuant to the advice of an attorney known to have been associated with Adams, Sr. The amount of the withdrawal is not shocking, for Mrs. Adams was, and had been, hospitalized for the treatment of terminal cancer. The bank was clearly unaware of any motive on the son's part to misappropriate these funds since it had no knowledge that he had been disinherited by his mother. Further, the fact he chose to transfer the funds into an account in trust for his mother was an acknowledgment of her ownership and consistent with his announced intention to use the funds for her benefit. In short, there was nothing in Adams, Jr.'s reputation, past conduct, or present conduct to indicate he would misuse these funds. So far as the bank knew, this transfer was legally made for an ostensibly legitimate purpose. It was not required under these circumstances to attribute an unlawful intention to him. Rodgers v. Bankers Nat. Bank, *supra*. Nor was it under any duty after the transfer was completed to insure that the son did not misuse these funds. Minn. St. 520.02. Apart from the question of whether the bank should have suspected that Adams, Jr., would misuse the transferred funds, no question as to its good faith is raised by the evidence.

■ Two other issues raised by this appeal are worthy of mention. Plaintiff-administrator claims that he was deprived of his constitutional right to a jury trial when the district court refused to submit his first cause of action to the jury. This claim is without merit. The first cause of action

202

did not involve any issues of fact. The only question was whether the undisputed facts were sufficient to render the bank liable. This is solely a question of law for the court to decide. Von Heyne v. Tompkins, 89 Minn. 77, 93 N. W. 901, 5 L.R.A. (N.S.) 524.

It is also claimed that the district court erred in basing part of one of its findings of fact upon Peterson's testimony that Adams, Jr., on October 15, 1960, told him that his attorney had suggested Mrs. Adams' account be transferred into a trust account. Plaintiff contends this testimony was hearsay, immaterial, and irrelevant. We cannot agree. This testimony had a direct bearing on the issue of what knowledge the bank had when it made the transfer on October 17, 1960. The fact that the requested transfer was purportedly based upon the advice of an attorney whose relationship to the Adams family was known to the bank's agent could reasonably have lent support to the legality and propriety of the son's request. Since it was offered not to establish the truth of the matter stated but merely to establish the knowledge the bank had when it made the transfer, it is admissible. Such testimony is not within the scope of the hearsay exclusion. State v. Schifsky, 243 Minn. 533, 69 N. W. (2d) 89.

The other assignments of error have been examined and are without merit.

Affirmed.

MR. JUSTICE PETERSON, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.