# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2804

_____

Buffets, Inc., a Minnesota corporation; OCB Restaurant Company, LLC, a Minnesota limited liability company; Ryan's Restaurant Group, Inc., a South Carolina corporation; Home Town Buffet, Inc., a Minnesota corporation; Tahoe Joe's, Inc., a Minnesota corporation; Fire Mountain Restaurants, LLC, a Delaware limited liability company

*Plaintiffs - Appellants*

v.

Dean Leischow

*Defendant*

BMO Harris Bank, formerly known as M & I Marshall & Isley Bank; U.S. Bank, N.A.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 14, 2013
Filed: October 21, 2013

_____

Before WOLLMAN and COLLOTON, Circuit Judges, and HOLMES,[1] District Judge.

_____

COLLOTON, Circuit Judge.

Buffets, Inc. brought this action against U.S. Bank and BMO Harris Bank ("BMO"), alleging among other things violations of the Uniform Fiduciaries Act ("UFA"). The district court[2] granted the banks' motions for summary judgment, and we affirm.

I.

Buffets, Inc. owned and operated approximately 546 restaurants in 39 States across the country. On January 7, 2007, Buffets hired LGI Energy Solutions, Inc. to manage its utility costs. The companies entered into a contract stating that LGI would provide customized reports describing and analyzing Buffets' utility bills, as well as analysis of Buffets' "existing rate structures to determine if a more cost effective rate is available."

The contract established a procedure by which LGI would pay utility bills on behalf of Buffets. After receiving a bill for one of Buffets' restaurants from the utility provider, LGI would send Buffets an "accounts payable report[]"; on the following day, Buffets would remit to a bank account held by LGI sufficient funds to cover the portion of the report Buffets approved, and LGI would then use those funds to pay Buffets' bill. The contract also set forth LGI's fees for managing Buffets' bills and

_____

[1]The Honorable P.K. Holmes, III, Chief Judge, United States District Court for the Western District of Arkansas, sitting by designation.

[2]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

for reducing Buffets' utility costs. Buffets paid these fees and remitted funds for bill payment into the same LGI bank accounts.

During its negotiations with LGI, Buffets sought to require LGI to set up a designated "fiduciary" account into which Buffets would deposit funds for bill payment, but LGI refused. Instead, Buffets agreed to a provision stating that "[a]t no time shall LGI have a legal or equitable interest in [Buffets'] funds and [Buffets] grants no security interest to LGI." LGI previously had opened "demand deposit accounts" in its name with U.S. Bank, and LGI used those accounts in managing Buffets' bills (and the bills of at least eight other clients) until fall of 2008. According to the contract between LGI and U.S. Bank, the bank presumed that the holder of an "[i]ndividual [a]ccount," such as LGI's account, owned the funds in that account. Under a separate treasury management services agreement, LGI represented to U.S. Bank that "any and all transfers and commingling of funds . . . requested by [LGI] . . . have been duly authorized by all necessary parties."

The U.S. Bank employees who managed LGI's accounts testified that LGI sometimes would pay a client's bill before receiving funds from that client, in which case the client would then reimburse LGI. LGI thus needed access to sufficient resources to pay its clients' considerable utility bills up front. To this end, U.S. Bank extended a $1 million line of credit to LGI in October 2007.

LGI's practice of paying its clients' utility bills before receiving payment from those clients also led to consistent "overdrafts"—that is, LGI would write checks for amounts in excess of the funds in its account. Because permitting a banking customer to overdraft its account increases a bank's exposure to risk, U.S. Bank began to monitor LGI's overdrafts on a daily basis in November 2007. U.S. Bank's records indicate, and one of its employees testified, that when LGI overdrafted its accounts, LGI's president, Dean Leischow, consistently represented to the bank that one of

LGI's clients would send a wire transfer to cover the overdraft. U.S. Bank always received a transfer sufficient to cover the overdrawn account.

In April 2008, Leischow sought to increase LGI's line of credit with U.S. Bank, and U.S. Bank declined. On April 9, BMO Harris Bank ("BMO") extended LGI a $3 million line of credit (later increased to $3.5 million), secured by a priority lien on LGI's assets, and personally guaranteed by Leischow. The contract included a condition requiring LGI to maintain its "primary depository accounts" at BMO. LGI opened four accounts at BMO: an "operating account" for LGI; a "customer payable funding account," into which LGI's clients would deposit funds; and two accounts from which LGI would pay its clients' bills.

LGI continued using its accounts at U.S. Bank and did not begin receiving deposits from clients to its accounts at BMO until September 2008. In that same month, LGI changed the title holder of its BMO customer bill payment accounts—but not its operating account—to Data Solutions, LLC, a new entity LGI formed to segregate its utility bill payment business from its other businesses. Buffets first transferred funds to an LGI account at BMO on November 5, 2008.

LGI moved funds among its accounts at U.S. Bank and BMO; this practice raised concerns at both banks. At some point between August and October 2008, U.S. Bank's loss-prevention unit detected a pattern of suspicious activity and conveyed information to employees who managed the bank's relationship with LGI about "check kiting"—a method by which a banking customer can obtain the equivalent of an interest-free loan by capitalizing on the lag time between a bank's crediting a customer's check and presenting that check for collection, *see Williams v. United States*, 458 U.S. 279, 281 n.1 (1982)—or other fraudulent behavior. Those employees decided not to take action beyond continuing to monitor LGI's accounts, because they considered Leischow "credible" based on past experience, and they "did not suspect that there was anything out of the ordinary in this situation other than his

-4-

business was not structured financially well." Leischow helped allay U.S. Bank's skepticism of LGI's business model on October 28, 2008, when he informed U.S. Bank that "[b]eginning this week [LGI] will no longer send checks [to utility providers] prior to having the funds from our clients. It is no longer worth the risk or hassle to us."

On November 5, 2008, BMO's fraud department detected activity suggesting check kiting and communicated that information to Todd Senger, who managed BMO's relationship with LGI. After confirming a kite, BMO's practice was to apply a "post no debits" status, which prevents the account holder from making withdrawals without sufficient supporting funds in the account. Unless the account manager filed a "kiting appeal letter," BMO would eventually shut down the account in question.

Senger contacted Leischow, who explained that the suspicious activity was attributable to "transition issues surrounding changing banks." Because LGI's clients continued to remit funds to LGI's account at U.S. Bank while LGI paid its clients' utility providers out of its accounts at BMO, LGI needed to move funds from bank to bank accordingly. Senger stated in an internal memorandum that he was "hard pressed to believe that this is true," and BMO documented a "confirmed kite." Senger applied a "post no debits" status to LGI's "customer payable funding account," and he never filed a kiting appeal letter to avoid shutting down the account, but the account was not closed immediately. In early November, when LGI had drawn on its entire $3.5 million line of credit with BMO, Leischow sought additional funding to weather "cash flow issues." BMO declined to extend additional credit to LGI, because it thought LGI "needs to start managing its accounts receivables better."

In a letter dated December 10, 2008, Leischow informed LGI's clients that LGI had "ceased operations." The letter also said that BMO had a priority lien on LGI's assets, and that because LGI's assets "will leave a significant deficiency claim owed to the bank . . . there will be no assets available for distribution to unsecured

creditors." Buffets then sought documentation from LGI to determine which, if any, of its utility bills had not been paid despite Buffets' having transferred funds to LGI's "customer payable funding account." LGI declined to provide any documentation. Over the ensuing weeks, Buffets claims that it paid approximately $3,471,238.54 toward utility bills for which it previously had remitted funds to LGI's account at BMO.

Buffets brought an action in state court, making an array of state-law claims against Leischow, LGI Energy Solutions, Data Solutions, and BMO on January 2, 2009. On February 6, 2009, other LGI creditors filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. After the bankruptcy court issued orders for relief in those proceedings, BMO removed the state court action to federal district court, asserting that the federal court had jurisdiction over the action because it was "related to" the bankruptcy case. *See* 28 U.S.C. § 1334(b). The district court[3] denied Buffets' motion to remand its claims against BMO and Leischow to state court or to abstain under 28 U.S.C. § 1334(c), and referred the case to federal bankruptcy court. Buffets then amended its complaint to add U.S. Bank as a defendant, to assert claims against both banks under the Uniform Fiduciaries Act, Minn. Stat. § 520.01 *et seq.*, and to drop all claims against LGI. The bankruptcy court transferred the case back to the district court. Buffets settled its claims against Leischow, and the district court dismissed him from the suit.

Both banks moved for summary judgment. As relevant to this appeal, the district court granted judgment for the banks on Buffets' claims under the UFA. The court observed that the funds in question were held in LGI's personal, non-fiduciary accounts, and that those accounts contained "commingled funds"—that is, not only

---

[3]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

funds transferred by Buffets to LGI for bill payment but also LGI's own funds and funds transferred to LGI from other clients. So the court concluded that Buffets had not demonstrated that either bank was "aware of the fiduciary relationship between Buffets and LGI," or that either bank had processed a transaction with knowledge of such facts as to amount to bad faith toward LGI's fiduciary obligations to Buffets.

Buffets now appeals, arguing that the district court lacked jurisdiction or should have abstained, and that the court erred on the merits in granting the banks' motions for summary judgment.

II.

Before addressing the merits, we must first consider some complicated jurisdictional issues. The district court asserted jurisdiction on the ground that the action was related to a Title 11 bankruptcy proceeding, 28 U.S.C. § 1334(b), and that abstention in favor of state-court litigation was not required under 28 U.S.C. § 1334(c)(2). The banks defend that rationale on appeal. The banks contend alternatively that if the district court lacked jurisdiction under § 1334(b), then the diversity of citizenship statute, 28 U.S.C. § 1332, gives this court jurisdiction, because the parties—although not completely diverse when the case was removed from state court—were diverse by the time the district court entered its judgment. For Buffets to prevail in its position that jurisdiction is lacking, therefore, it must establish that either (1) the district court had "related to" bankruptcy jurisdiction but should have abstained, or (2) the district court lacked "related to" bankruptcy jurisdiction, and later-acquired diversity of citizenship is insufficient to establish jurisdiction on appeal. Although the question of "related to bankruptcy" jurisdiction is difficult and close, we conclude that the answer ultimately does not affect our jurisdiction: If the district court had "related to" bankruptcy jurisdiction, then it did not abuse its discretion in refusing to abstain. If the district court lacked "related to"

-7-

bankruptcy jurisdiction, then diversity of citizenship is a sufficient basis for this court to address the appeal.

The district court's assertion of "related to" bankruptcy jurisdiction was premised on an indemnification claim that BMO brought against LGI under the contract between those parties. The theory was that if BMO prevailed, then the judgment against LGI could "conceivably have any effect" on the LGI bankruptcy. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Titan Energy, Inc.* (*In re Titan Energy, Inc.*), 837 F.2d 325, 330 (8th Cir. 1988) (internal quotation omitted). "[E]ven a proceeding which portends a mere contingent or tangential effect on a debtor's estate meets th[is] broad jurisdictional test." *Id.*

We think the court was correct that if BMO has an enforceable indemnification claim against LGI, then its claim conceivably could affect the bankruptcy. Buffets counters that if the banks are liable in this action, then their ensuing indemnification claims would be the same as the claims Buffets would bring against LGI if the banks are dismissed, so there would be no effect on the bankruptcy. But the various potential claims against LGI would cover more than just the amount of a judgment in Buffets' favor, and may differ depending on the outcome of this action. In particular, the banks and Buffets will incur attorney's fees during the course of these proceedings, and the banks' fees may well differ from those incurred by Buffets. So the claims conceivably could affect LGI's liabilities. *See Dogpatch Props., Inc. v. Dogpatch U.S.A., Inc.* (*In re Dogpatch U.S.A., Inc.*), 810 F.2d 782, 786 (8th Cir. 1987).

We also believe it was not error for the district court to proceed without abstaining in favor of parallel state-court proceedings. Section 1334(c)(2) provides that where the sole basis for federal jurisdiction is that a claim is related to a case under title 11, "the district court shall abstain from hearing such proceeding if an action is commenced, *and can be timely adjudicated*, in a State forum of appropriate

-8-

jurisdiction." 18 U.S.C. § 1334(c)(2) (emphasis added); *see In re Titan Energy, Inc.*, 837 F.2d 325, 333 & n.14 (8th Cir. 1988). In support of its motion to abstain from adjudicating claims against BMO (U.S. Bank was not yet a party), Buffets argued that the court must abstain if "(1) the parties file a timely motion; (2) the proceeding is based upon a state law claim or state law cause of action; and (3) the proceeding is related to a case under title 11 but does not arise under title 11." R. Doc. 8, at 32. As BMO argued in response to the motion, however, Buffets did not argue that the case would be timely adjudicated in state court or provide any evidence on that issue. Buffets did present evidence on timely adjudication later, in a reply to BMO's response, but the district court determined that the submission was untimely under the local rules of practice.

The local rules then in effect provided that a party responding to a "dispositive motion" must file and serve a memorandum of law and any affidavits and exhibits. D. Minn. L.R. 7.1(b)(2) (2009). The rule provided for a reply memorandum by the movant, but an advisory committee's note to the rule stated as follows:

> Rule 7.1(b)(2) specifically contemplates that the factual basis for a dispositive motion will be established with affidavits and exhibits *served and filed in conjunction with the initial motion and the responding party's memorandum of law. . . .* The rule contemplates that the discovery record will allow the initial summary judgment submission to anticipate and address the responding party's factual claims. *Reply affidavits are appropriate only when necessary to address factual claims of the responding party that were not reasonably anticipated.*

D. Minn. L.R. 7.1, 1999 advisory committee's note (emphases added).[4]  Citing this commentary, the district court concluded that Buffets reasonably should have anticipated that all six of the mandatory abstention factors—including timely adjudication in state court—would be addressed.  The district court thus declined to consider the evidence on timely adjudication that Buffets submitted with its reply memorandum, and ruled that Buffets failed to meet its burden of proof to show that abstention was mandatory.

The district court has considerable discretion in applying its local rules, *see Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 579 (8th Cir. 2006), and we conclude that the court did not abuse its discretion by rejecting evidence that Buffets proffered with its reply memorandum.  Buffets' evidence was readily available when it filed its initial moving papers, and it was reasonable for the district court to enforce its local requirement that where a movant reasonably should anticipate that an issue will be addressed by the court, the movant must present evidence with its motion rather than wait until a reply, at which point the opposing party has no opportunity to respond in the normal briefing process.  Buffets does not dispute that it bore the burden to demonstrate that abstention was required in the case of a dispute, *see* Reply Br. 20 (citing *In re Ascher*, 128 B.R. 639, 644 (Bankr. N.D. Ill. 1991), but argues that it "did not believe that Respondent BMO would factually challenge the timely adjudication issue."  *Id*.  The district court was within it discretion to determine that a movant seeking mandatory abstention must set forth argument and evidence necessary to satisfy all of the mandatory abstention factors.  Because Buffets failed to do so, the district court did not err in declining to abstain.

---

[4]Local Rule 7.1 was amended in 2004 to eliminate a provision that counsel were required to file dispositive motions and supporting documents *only after* the motion was fully briefed by all parties pursuant to the time limits set forth in the rule.  The 2004 amendments, however, did not alter the requirement that a movant must file affidavits and exhibits with its dispositive motion, and we see nothing in the 2004 amendments that would render the 1999 advisory committee's note inapplicable.

The "related to" bankruptcy jurisdiction question is close and difficult, however, because if the banks were held liable for processing a transaction in bad faith under the Uniform Fiduciaries Act, *see* Minn. Stat. § 520.09, then the violation may be an intentional tort under Minnesota law, *cf. Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986); *Prichard Bros. v. Grady Co.*, 436 N.W.2d 460, 466 (Minn. Ct. App. 1989), and Minnesota law suggests that intentional tortfeasors cannot enforce indemnification provisions. *See Maverick Fin. Grp. v. State Bank of Loretto*, No. C8-02-692, 2002 WL 31749161, at *5 (Minn. Ct. App. Dec. 10, 2002); *cf. Oelschlager v. Magnuson*, 528 N.W.2d 895, 899 (Minn. Ct. App. 1995). If the banks could not enforce the indemnification provisions against LGI, then the indemnification claims could not conceivably have an effect on the bankruptcy.

For this reason, we have considered the banks' alternative contention that diversity of citizenship provides a basis for appellate jurisdiction. We conclude that even if the district court lacked "related to" bankruptcy jurisdiction—because the banks cannot pursue indemnification claims against LGI—we have jurisdiction over this appeal under the rationale of *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996).

In *Caterpillar*, the plaintiff was injured by a product and sued the out-of-state manufacturer and the in-state servicer. *Id.* at 64-65. The plaintiff then settled with the servicer, and the manufacturer filed a notice of removal in federal district court. *Id.* at 65. At the time of removal, however, complete diversity did not exist: although the non-diverse servicer had settled with the plaintiff, the court had not dismissed it from the lawsuit because the plaintiff's insurer had an outstanding subrogation claim against the servicer. *Id.* The district court nonetheless denied the plaintiff's motion to remand, believing incorrectly that the plaintiff's settlement agreement rendered the parties diverse. *Id.* at 66. After denying the motion, but before the case proceeded to trial and judgment, the court dismissed the in-state servicer. *Id.*

On appeal, the initial lack of diversity gave rise to two distinct problems: (1) federal subject matter jurisdiction did not exist at the time of the notice of removal was filed, and (2) the removal did not comply with 28 U.S.C. § 1441(a). The Supreme Court concluded that the dismissal of the jurisdictional spoiler prior to judgment cured the defect in subject matter jurisdiction. *Caterpillar*, 519 U.S. at 64. And as "there was no longer any jurisdictional defect," *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 574 (2004), the statutory defect under the removal statute did not require dismissal, because where the action has already proceeded to judgment, "considerations of finality, efficiency, and economy become overwhelming." *Caterpillar*, 519 U.S. at 75.

In this case, the parties were not completely diverse at the time of removal, because defendants Data Solutions and Leischow were citizens of the same State as Buffets. But BMO removed on the basis of "related to" bankruptcy jurisdiction, not diversity jurisdiction, so the lack of diversity did not bear on the court's jurisdictional determination. After the court denied Buffets' motion to remand, Buffets amended its complaint to drop all claims against Data Solutions and settled with Leischow. The district court then dismissed Leischow from the suit, leaving only parties with complete diversity of citizenship.

On one side of the case, the defendant banks are citizens of Illinois and Ohio. A national bank is a citizen of the State in which its main office, as set forth in its articles of association, is located. *Wells Fargo Bank, N.A. v. WMR e-PIN, LLC*, 653 F.3d 702, 710 (8th Cir. 2011); *see Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006). According to BMO's articles of association, filed with this court on October 19, 2012, BMO's main office is in Illinois.[5] U.S. Bank says its main office is in Ohio.

---

[5]Buffets originally brought this action against M&I Marshall & Ilsley Bank, which BMO succeeded by merger during the course of the litigation. M&I was a Wisconsin corporation with its principal place of business in Wisconsin, and its earlier presence in the action was consistent with complete diversity of citizenship at

-12-

Buffets argues that U.S. Bank is a citizen of Minnesota, based on its disagreement with the legal rule established in *WMR e-PIN*, but it does not dispute that U.S. Bank's main office is in Ohio. Reply Br. 9 n.3. We take judicial notice, based on records of the Office of the Comptroller of the Currency, that U.S. Bank's main office is in Ohio. *See* http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-active-bank-lists.html (visited Oct. 15, 2013); *see Peterson v. U.S. Bank Nat'l Ass'n*, 918 F. Supp. 2d 89, 99 n.13 (D. Mass 2013); *see also U.S. Bank Nat'l Ass'n v. Polyphase Elec. Co.*, No. 10-4881, 2011 WL 3625102, at *1 (D. Minn. Aug. 17, 2011) ("Plaintiff U.S. Bank is a national banking association, and its Amended and Restated Articles of Association designate Cincinnati, Ohio, as the location of its main office."); *id.*, R. Doc. 26-1 (Amended and Restated Articles of Association). On the other side, the banks assert that the Buffets group of plaintiffs are citizens of Minnesota or South Carolina. Buffets, which of course would know if any plaintiff were a citizen of Ohio or Illinois, does not dispute the point. The citizenship of the plaintiffs at the time of judgment was thus diverse from the citizenship of the banks in Ohio and Illinois.[6]

---

the time of judgment. *See* 28 U.S.C. § 1332(c)(1); *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). *Cf. Grupo Dataflux*, 541 U.S. at 574-75.

[6]Buffets acknowledges that it is incorporated in Minnesota and has its principal place of business in Minnesota, BankA 207 ¶ 19, so it is a citizen of Minnesota. Buffets is the sole member of OBC Restaurant Company LLC, *see* Appellant's Br. ii, so OBC is a citizen of Minnesota. *See One Point Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007) ("An LLC's citizenship, for purposes of diversity jurisdiction, is the citizenship of each of its members."). Ryan's Restaurant Group, Inc., is incorporated in South Carolina, BankA 207 ¶ 19, maintained its principal executive offices in South Carolina after its merger with parent corporation Buffets in 2006, *see* http://www.sec.gov/Archives/edgar/data/355622/000095014406010041/g0398291sv8pos.htm (visited Oct. 15, 2013), and gives no indication that its principal place of business is elsewhere. Ryan's is the sole member of Fire Mountain Restaurants LLC, Appellant's Br. ii, thus making Fire Mountain's citizenship the same as Ryan's. Tahoe Joe's, Inc., is incorporated in Minnesota, BankA 207 ¶ 19,

As in *Caterpillar*, therefore, the parties here were not completely diverse at the time of removal, but the district court dismissed the jurisdictional spoiler prior to judgment. *Caterpillar* involved a trial, while this case was resolved on summary judgment, but we think the same considerations of finality, efficiency, and economy that "provided the *ratio decidendi* in *Caterpillar*," *Grupo Dataflux*, 541 U.S. at 572, are persuasive in this context. *Caterpillar* suggests a categorical rule, not a case-by-case inquiry into how much time was spent litigating each particular case in the district court. *See Junk v. Terminix Int'l Co.*, 628 F.3d 439, 447 (8th Cir. 2010) (applying *Caterpillar* in the summary judgment context); *accord Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262, 265 (4th Cir. 1998). *But cf. GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 633-34 (7th Cir. 2013). So if the only statutory defect were noncompliance with the removal statute's diversity requirement, then it would be clear that we have jurisdiction under *Caterpillar*.

The indelible history of this case, however, includes another statutory defect in the banks' appellate invocation of diversity jurisdiction. BMO removed solely on the basis of "related to" bankruptcy jurisdiction under 28 U.S.C. § 1452(a), so its "short and plain statement of the grounds for removal" required by 28 U.S.C. § 1446(a) did not include diversity jurisdiction. Nonetheless, we think the rationale behind *Caterpillar*'s rule applies to this situation too. The Court recognized the "hardly meritless" argument that "ultimate satisfaction of the subject-matter jurisdiction requirement ought not swallow up antecedent statutory violations," but determined that "considerations of finality, efficiency, and economy become overwhelming" once a diversity case has proceeded to trial and judgment in federal court. *Caterpillar*, 519 U.S. at 74-75. We doubt the balance the Court struck was

and maintains its corporate support center in California. *See* http://www.tahoejoes. com/index.php?option=com_contact&task=view&contact_id=1&Itemid=122 (visited Oct. 15, 2013); *cf. Koreen v. Tahoe Joe's, Inc.*, 2009 WL 4030954, at *1 (E.D. Cal. Nov. 18, 2009); *id.*, R. Doc. 13, Order (Nov. 6, 2009) (Tahoe Joe's argued that "nerve center" of business was in Minnesota, although support center was in California).

tied to the particular statutory defect in that case, but rather think it should apply irrespective of the antecedent statutory violation. *See, e.g.*, *Moore v. N. Am. Sports, Inc.*, 623 F.3d 1325, 1329-30 (11th Cir. 2010) (per curiam) (applying *Caterpillar* and upholding the denial of a motion to remand where the statutory defect concerned the timeliness of the notice of removal); *Huffman v. Saul Holdings, L.P.*, 194 F.3d 1072, 1079-80 (10th Cir. 1999) (same). As such, whether or not the statutory defect at issue concerns the presence of complete diversity at the time of removal, the content of the notice of removal, or (as here) both, the same "considerations of finality, efficiency, and economy" overwhelm the considerations that favor remanding where the case has proceeded to judgment. *Caterpillar*, 519 U.S. at 75.

For these reasons, we are satisfied that jurisdiction is proper. We will consider the merits of the appeal, reviewing the district court's grant of summary judgment *de novo*, and granting all reasonable inferences to the non-movant. *See Reuter v. Jax Ltd.*, 711 F.3d 918, 919 (8th Cir. 2013).

III.

Minnesota's version of the Uniform Fiduciaries Act, Minn. Stat. § 520.01 *et seq.*, contains separate sections governing "[d]eposit[s] in name of fiduciary as such" and "[d]eposit[s] in fiduciary's personal account." Minn. Stat. §§ 520.07, 520.09. The section governing deposits in a fiduciary's personal account shields banks from liability for receiving a deposit that breaches a fiduciary's obligations to a principal, "unless the bank receives the deposit . . . with actual knowledge that the fiduciary is committing a breach of an obligation as fiduciary in making such deposit . . . or with knowledge of such facts that its action . . . amounts to bad faith." *Id.* § 520.09. It further provides that "[i]f a person who is a fiduciary makes a deposit" into the fiduciary's personal account, "the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of an obligation as fiduciary." *Id.*

-15-

The UFA does not define "bad faith," but it defines the phrase "in good faith": "A thing is done 'in good faith' when it is done honestly, whether it be done negligently or not." Minn. Stat. § 520.01, subd. 6. In its only discussion of the meaning of "bad faith" under the Act, the Supreme Court of Minnesota said that "[b]ad faith does not exist if the bank was acting honestly." *Rheinberger v. First Nat'l Bank of St. Paul*, 150 N.W.2d 37, 41 (Minn. 1967) (internal quotation omitted). More recently, the Minnesota Court of Appeals considered *Rheinberger* and concluded in an unreported opinion that "there is no precedent for the proposition that dishonesty cannot arise in the form of a [bank's] toleration of a severe practice of overdrafts or significant evidence of check kiting." *McCartney v. Richfield Bank & Trust Co.*, Nos. CX-00-1466, C1-00-1467, 2001 WL 436154, at *4 (Minn. Ct. App. May 1, 2001).

Invoking the standard suggested by *McCartney*, Buffets contends that the district court erred in dismissing its claims under the UFA. Buffets relies on evidence that in November 2008, LGI transferred $3,650,738.26 from its customer bill payment account at BMO to LGI's operating accounts or other accounts controlled by Leischow, in breach of LGI's utility-management contract with Buffets. Buffets further asserts that LGI transferred $6,066,078.00 from its customer bill payment account at U.S. Bank to LGI's operating account at U.S. Bank over the course of 2008. When LGI ceased operations, it had failed to pay approximately $3,471,238.54 in utility bills for which Buffets had remitted funds to LGI. Relying chiefly on *McCartney* and opinions from other jurisdictions, Buffets contends that a bank acts in "bad faith" if it engages in "commercially unjustifiable" actions. With this understanding of the bad-faith standard, Buffets argues that there is a material issue of fact as to whether the banks acted in bad faith by permitting LGI to transfer funds from its client bill payment accounts into its own operating account, and by failing promptly to close LGI's accounts after detecting suspicious banking activity in LGI's accounts.

-16-

Buffets' claims do not correspond to the text of the Act. The UFA is drawn in terms of specific transactions made in violation of certain fiduciary obligations, Minn. Stat. § 520.09; Buffets' claims operate at a higher level of generality. Buffets first aggregates all of the funds that LGI transferred from its bill payment accounts to its operating accounts and assumes that those transactions must have been made in violation of a fiduciary duty. Buffets then points to the amount it "double paid" on utility bills—*i.e.*, the amount it remitted to LGI that LGI never forwarded to Buffets' utility provider—and claims that the banks necessarily received deposits of that amount in bad faith. Essentially, Buffets argues that the UFA required the banks to (1) keep constant tabs on how much money in LGI's accounts came from Buffets, (2) determine how much of that money represented bill payment funds rather than LGI's fees, and (3) prohibit LGI from depleting the total funds in its account below that amount unless and until LGI transferred that amount to Buffets' utility provider. And the banks were required to do all of this, Buffets suggests, even though LGI held accounts titled in its own name that contained not only Buffets' funds but also funds belonging to other LGI clients and to LGI itself, and despite the fact that Buffets never communicated directly with the banks.

When asked about this apparent mismatch between its aggregated claims and the targeted text of the UFA, Buffets asserted at oral argument that it had identified "hundreds" of specific transactions. But it also acknowledged that it may not have alleged in its summary judgment papers that the banks processed any particular transaction in bad faith toward a breached fiduciary obligation, or that each transaction it identified constituted a breach of LGI's obligations as fiduciary. Further reflecting this disconnect between Buffets' theory and the statutory text, Buffets claims that the banks violated the Act by failing to close LGI's accounts *in toto*, not that the banks acted in bad faith by receiving any particular deposits that it has identified.

The Uniform Fiduciaries Act does not afford this sort of general protection to principals. The Act provides principals limited protection against a bank's knowing or bad-faith processing of a *specific* transaction that breaches a fiduciary obligation. Minn. Stat. § 520.09. For the bank to act with bad faith in a particular transaction, the bank must be aware that the funds in question are held pursuant to a fiduciary obligation in the first place. *See Rodgers v. Bankers' Nat'l Bank*, 229 N.W. 90, 92-94 (Minn. 1930). Buffets has not shown that a genuine dispute exists as to whether, despite the commingled, non-fiduciary nature of LGI's accounts, the banks were so aware. And in the context of a fiduciary's deposits into his personal account—like those Buffets alleges constituted the breach in this case—the Act expressly provides that a bank "is not bound to inquire whether the fiduciary is committing . . . a breach of an obligation as fiduciary," thus foreclosing Buffets' argument that the banks should have determined on their own initiative whether those transfers violated LGI's fiduciary duties. Minn. Stat. § 520.09. Buffets cannot fit its square-peg claims through the round hole of the UFA.

If Buffets wanted to ensure that it would be able to hold LGI's banks liable in the event that LGI breached its obligations, then it could have put the banks on sufficient notice of its fiduciary relationship with LGI in a number of ways. It could have insisted in contract negotiations that LGI must set up a fiduciary account for Buffets' funds. Or Buffets could have negotiated a provision requiring LGI to set up a segregated account dedicated only to Buffets' utility bills. Or it could have informed the banks directly of the nature of its relationship with LGI. *See Am. Nat'l Bank of St. Paul v. Nat'l Indem. Co. of Omaha*, 222 F.2d 513, 519 (8th Cir. 1955). Buffets declined to pursue these courses of action, any of which might have facilitated a showing that the banks received particular deposits with "actual knowledge" that LGI was acting in breach of a fiduciary duty, or that the banks had knowledge of such facts that its receiving particular deposits amounted to "bad faith." Having failed to avail itself of opportunities for greater protection, Buffets cannot now secure relief from the banks by stretching the UFA beyond its terms.

-18-

Aside from this conceptual problem with Buffets' claims, we do not think the company has demonstrated a genuine issue of fact for trial under the governing standard. Even if we assume that Buffets has presented evidence of specific transactions as required by the UFA, several considerations render Buffets' reliance on *McCartney* misplaced.

*McCartney* concerned a fiduciary's misappropriation of funds held "in [the] name of [a] fiduciary as such," Minn. Stat. § 520.07, rather than "in [the] fiduciary's personal account," as in this case. *Id.* § 520.09; *McCartney*, 2001 WL 436154, at *1. That the account in question was a designated "trust account," *id.*, was important to the *McCartney* court's statement that a bank's toleration of "a severe practice of overdrafts or significant evidence of check kiting" can constitute bad faith. *Id.* at *4. Where funds are held in a fiduciary account and the bank is thus aware that they do not belong to the fiduciary, the nature of the account necessarily puts the bank on notice of fiduciary obligations. So it follows that the fiduciary's suspicious banking practices alone can indicate a violation of those obligations and the bank's bad faith. Where funds are held in the fiduciary's *personal* account, by contrast, overdrafts and check kiting do not necessarily implicate a fiduciary duty. The bank may be unaware that any funds are held subject to a fiduciary obligation. Even if the bank knows that fiduciary obligations apply to some funds in the account, overdrafts and check kiting may not involve those specific funds, so the bank may not be acting in bad faith in processing any particular transaction.

Given this distinction, *McCartney* is best read to mean that a bank's toleration of "a severe practice of overdrafts or significant evidence of check kiting" by itself amounts to bad faith only in the context of either a designated fiduciary account or a segregated account that the bank knows contains the principal's funds. *McCartney*, 2001 WL 436154, at *4. Because Buffets' funds were held in an account titled in LGI's name rather than a fiduciary account, and because those funds were

-19-

commingled with funds belonging to other LGI clients and to LGI itself, the analogy to *McCartney* is wanting.

The legal standard applied in *McCartney* and its cited authorities from other jurisdictions, moreover, is not as broad as Buffets suggests. Buffets contends that *McCartney* established that bad faith exists not only where a bank acts dishonestly, as stated in *Rheinberger*, 150 N.W.2d at 41, but also where a bank takes "commercially unjustifiable" actions. Because the banks' failure to close LGI's accounts in the face of LGI's suspicious banking behavior was commercially unjustifiable, Buffets contends, the banks acted in bad faith within the meaning of the Act. *McCartney*, however, did not establish the free-standing "commercially unjustifiable" standard that Buffets describes.

First, *McCartney* did not use the phrase "commercially unjustifiable." Its discussion of bad faith is cast in terms of "dishonesty," suggesting that the court applied *Rheinberger* rather than expanded it. *McCartney*, 2001 WL 436154, at *4. *McCartney* explained that a bank's toleration of certain suspicious practices could amount to bad faith, because in some circumstances that toleration would constitute dishonesty with regard to the fiduciary's obligations—not because that toleration would be commercially unjustifiable in the banking industry generally speaking. *Id.*

Second, *McCartney*'s cited authorities from other jurisdictions that use a "commercially unjustifiable" standard do not stand for the proposition that *all* commercially unjustifiable actions expose banks to liability for a fiduciary-customer's breach of his obligations as fiduciary. Rather, they focus on "whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available." *Trenton Trust Co. v. W. Sur. Co.*, 599 S.W.2d 481, 492 (Mo. 1980) (en banc). In other words, the inquiry is into whether the bank exhibited "the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, that is to

-20-

say, . . . an intentional closing of the eyes or stopping of the ears." *Id.* (quoting *Davis v. Pa. Co. for Ins. on Lives & Granting Annuities*, 12 A.2d 66, 69 (Pa. 1940)); *see Watson Coatings, Inc. v. Am. Express Travel Related Servs., Inc.*, 436 F.3d 1036, 1041 (8th Cir. 2006) (applying Missouri law) ("The test of bad faith is whether it is commercially unjustifiable for the person accepting a negotiated instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is 'bad faith' to remain passive.") (internal quotation omitted); 5A *Michie on Banks and Banking* § 5 at 60 (2003) ("The Uniform Fiduciary Act shields banks from liability when they act honestly in fiduciary relationships, but not when they wink at obvious irregularities.").

Neither bank in this action remained passive in a manner similar to the bank's passivity in *McCartney*. In *McCartney*, the fiduciary misappropriated a significant percentage of the funds in a trust account through a check-kiting scheme that ran from June 1993 to at least April 1996. *McCartney*, 2001 WL 436154, at *1-2. Even though the bank detected suspicious activity and informed the fiduciary that "the overdrafts must stop" in 1994, it "continued to honor his checks drawn on insufficient funds and never contacted any of the other banks when a suspect-kiting entry would appear on his account reports." *Id.* at *2. In this case, however, upon detecting suspicious activity, both banks took action: U.S. Bank monitored LGI's accounts for overdrafts on a daily basis, and BMO restricted LGI's accounts such that LGI could only make transfers that were supported by sufficient funds, thereby precluding further overdrafts. Both banks refused to increase LGI's line of credit after discovering LGI's suspicious activity. Buffets has not established a genuine dispute as to whether either bank was indifferent to LGI's suspicious activity, such that its actions amounted to bad faith. *See McCartney*, 2001 WL 436154, at *4 n.2.

\*     \*     \*

-21-

For the foregoing reasons, the judgment of the district court is affirmed. BMO's motion to supplement the record to include its articles of association is granted.

_____