# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-3965

_____

Phil Rosemann; Judith Smith; Suzanne Glisson; Clark Amos; Odis Hash; Mark Bernstein; Marie Merlotti; Robert Givens; Preston Amos; Clayton Givens; Jill Wittenmyer; Mary O'Sullivan, individually and as Trustee of the Thomas E. O'Sullivan Revocable Living Trust and Neil J. O'Sullivan Trust and Executor of Neil J. O'Sullivan Estate; Donna Hogshooter; Thomas Currier; Rudolf Ouwens; Barbara O'Hanlon, as successor co-trustee of the Angelene Block Revocable Trust and as trustee of the Barbara J. O'Hanlon Living Trust; Roy Currier; Richard Aguilar; Billy Harrison; Sheila Mays; Elaine Reed; Cindy Merlotti; Buddy Quessenberry; Dorothy Smith; Arlene Sincoski; Jerry Cronkite; Northwest Properties (1973), LTD; Marjorie Bernstein; Stanley Kuhlo; Lewis Bernstein; Brad Werner, trustee of the JH Werner Revocable Trust; Tom Bertani; Daryll Currier; Jim Neill; Lorena Messenger; Homer Smith; Henry Barthel; Casey Cook; Mark Merlotti; Donna Bertani; John Holl; Gary Smith; Charles Davis; Stanko Matayo; Carol McCarthy, as successor co-trustee of the Angelene Block Revocable Trust & co-trustee of the Carol A. McCarthy Living Trust; Delores Cook; William McLemore; Wanda Lavender; Carol Green; Lewis Vollmar; Daren Mays; William Wantling; Ben Miller; Kent Sturhahn; Sharon Cobb; Gifford Jordan; Mark Cunningham; Bonita Cobb; Melba Aguilar; Thomas Barnes; Dorothy Ziegler; Leonard Roman; John Shahan; Bob Moore; Julia Barthel; Audrey Holl; Barbara Jordan; Eric Wittenmyer

*Plaintiffs - Appellants*

v.

St. Louis Bank

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 14, 2016
Filed: May 24, 2017

_____

Before WOLLMAN, SMITH,[1] and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

This case continues to chronicle the legal consequences flowing from Martin Sigillito's Ponzi scheme known as the British Lending Program (BLP). *See, e.g.*, *Aguilar v. PNC Bank, N.A.*, 853 F.3d 390 (8th Cir. 2017); *United States v. Sigillito*, 759 F.3d 913 (8th Cir. 2014). Sigillito maintained commercial accounts at defendant St. Louis Bank during the Ponzi scheme's life. In this case, the plaintiffs, seeking to recoup losses due to the BLP, sued St. Louis Bank, alleging (1) violations of Missouri's Uniform Fiduciaries Law (UFL); (2) aiding and abetting the breach of Sigillito's fiduciary duties; (3) conspiracy to breach Sigillito's fiduciary duties; and (4) conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). The district court[2] granted summary judgment to St. Louis Bank, and the plaintiffs appeal. We affirm.

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

[2]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, sitting by designation.

# I. *Background*

## A. *Martin Sigillito and the BLP*

Sigillito, an attorney located in St. Louis, Missouri, and J. Scott Brown, an attorney in Kansas, formed the BLP in the late 1990s. They formed the BLP to serve as "an investment program to facilitate loans to an English law firm . . . to fund 'black lung' claims brought on behalf of English coal miners. In approximately 2000 or 2001, the BLP began marketing loans for purported investments in real estate developments in England." *Aguilar*, 853 F.3d at 395. Sigillito operated the BLP from 1999 to 2010. During the Ponzi scheme, Sigillito directed investors to deposit money for BLP loans into his Interest on Lawyers Trust Account (IOLTA). But instead of sending the funds to England for investment, Sigillito fraudulently drew the funds out of his IOLTA account for distribution to himself and others. In 2012, "Sigillito was convicted of multiple counts of wire fraud, mail fraud, conspiracy to commit wire and mail fraud, and money laundering because of his involvement in" the BLP Ponzi scheme. *Sigillito*, 759 F.3d at 920.

## B. *St. Louis Bank's Role*

From 2006 to 2010, Sigillito was a commercial customer at St. Louis Bank. Sigillito's accounts at St. Louis Bank included (1) the Martin T. Sigillito & Associates, Ltd. business account ("Business Account"); (2) the Martin T. Sigillito & Associates, Ltd. business checking account ("Checking Account"); and (3) the Martin T. Sigillito Attorney At Law IOLTA. In addition, Sigillito had lines of credit at St. Louis Bank ("4316 Loan" and "4382 Loan" (collectively, "MTSA Loans")) and a Certificate of Deposit Account Registry Service (CDARS).

Except for plaintiff Phil Rosemann's money, Sigillito deposited most of the BLP investors' funds into the IOLTA and immediately transferred them into another account. Investors authorized Sigillito to manage their investments for them. Rosemann signed four handwritten authorizations directing St. Louis Bank to follow instructions from Sigillito on specific transactions.

Primarily, two St. Louis Bank employees interacted with Sigillito during the relevant time period: Craig Hingle and Julie Ohlms. Hingle served as a commercial loan officer at St. Louis Bank from 2005 until 2012. Previously, Hingle worked as a loan officer at Allegiant Bank and knew Sigillito as a trust customer. While at Allegiant Bank, Hingle set up a commercial line of credit for Sigillito and hired Sigillito to create a trust for Hingle's children. During his employment with St. Louis Bank, Hingle helped to secure and service lines of credit for Sigillito and Rosemann. Hingle was generally aware of the BLP and knew that Sigililto was involved with it.

Ohlms was the Assistant Vice President of Treasury Management at St. Louis Bank from 2006 to 2010. She worked with Sigillito and Elizabeth Stajduhar, his executive assistant, on various financial transactions, such as wire transfers, transfers between accounts, and check cashing. Stajduhar was responsible for reconciling Sigillito's IOLTA and reviewing monthly account statements. Stajduhar frequently contacted Ohlms to transfer money. At some point, Stajduhar began stealing money out of Sigillito's accounts by writing checks payable to "Elizabeth Perigen," her maiden name. Sigillito discovered Stajduhar's defalcation and asked Ohlms to tell him if any checks payable to "Elizabeth Perigen" were cashed. Ohlms called Sigillito's office, spoke to Stajduhar, and asked her to tell Sigillito that these checks were being cashed. Ohlms did not know that Stajduhar *was* Perigen. Stajduhar never explained anything about the BLP to Ohlms and "did not want [Ohlms] to know what was going on." Nothing in Stajduhar's "conversation with [Ohlms] suggested that [Ohlms] knew that [Stajduhar] or somebody was stealing—just that Sigillito wanted to know when these checks were cashed."

The only discussions that Stajduhar and Sigillito had with Ohlms "concerned issues with the accounts, and at no time did the discussions concern[] the BLP." At no time did Stajduhar or Sigillito provide St. Louis Bank with any fee deduction authorities, loan agreements, spreadsheets, reconciliation of the IOLTA, or other BLP transaction records, nor did they provide documentation showing where investors

thought their money was going or the intent behind deposits. Stajduhar "never explained to anyone at [St. Louis] Bank what was going on with the BLP borrowers . . . , and no one explained these to [St. Louis] Bank when checks were issued with various names in the memo lines." Neither Stajduhar nor Sigillito informed St. Louis Bank that Sigillito was only engaged in work for the BLP, as opposed to other types of legal work. And they never spoke with St. Louis Bank about how BLP investments were distributed. In May 2010, Stajduhar believed that Sigillito was defrauding his investors; however, she never informed St. Louis Bank.

Sigillito engaged in *numerous* transactions at St. Louis Bank, beginning in 2006. The most relevant transactions occurred in 2008, 2009, and 2010, as thoroughly detailed in the district court's order. *See Rosemann v. St. Louis Bank*, No. 14-CV-983-LRR, Doc. 152 at 8–15 (E.D. Mo. Nov. 17, 2015).

## C. *Procedural History*

Sixty-eight plaintiffs filed suit against St. Louis Bank, alleging (1) violation of Missouri's UFL ("Count I"); (2) aiding and abetting breach of fiduciary duty ("Count II"); (3) conspiracy to breach fiduciary duty ("Count III"); and (4) conspiracy to violate RICO ("Count IV"). St. Louis Bank moved for summary judgment on all claims, and the plaintiffs moved for partial summary judgment on Count I. In a 60-page opinion, the district court granted St. Louis Bank's motion for summary judgment on all claims and denied the plaintiffs' motion for partial summary judgment on Count I.

## II. *Discussion*

The plaintiffs appeal the district court's grant of summary judgment to St. Louis Bank on all claims and the district court's denial of summary judgment to them on Count I (UFL claim).

"We review *de novo* a district court's grant or denial of summary judgment." *Aguilar*, 853 F.3d at 401 (quoting *Myers v. Lutsen Mountains Corp.*, 587 F.3d 891, 892 (8th Cir. 2009)).

## A. *Count I—UFL Claim*

The plaintiffs argue that the district court erred in granting summary judgment to St. Louis Bank on Count I for violations of the UFL. They contend that the undisputed evidence establishes that (1) Sigillito was a fiduciary of the IOLTA; (2) Sigillito breached his fiduciary duty; and (3) St. Louis Bank (a) had actual knowledge of Sigillito's breach, (b) acted in bad faith, or (c) knew that Sigillito received a benefit from the breach of his fiduciary duty.

We recently set forth the state of the law regarding Missouri's UFL in *Aguilar*. *See* 853 F.3d at 405–06. As in *Aguilar*, the UFL provision at issue provides:

> If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary *unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that this action in taking the instrument amounts to bad faith.* If, however, such instrument is *payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary*, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument.

Mo. Ann. Stat. § 469.270 (emphases added).

Contrary to the plaintiffs' contention, § 469.270 is not a strict-liability statute. *Aguilar*, 853 F.3d at 409. Under the first sentence of § 469.270, a bank is not "liable for a fiduciary's breach of duty absent either (1) actual knowledge of the breach or (2) knowledge of sufficient facts to constitute bad faith." *Id*. at 406 (quotations omitted). Under the second sentence of § 469.270,

> a payee is liable to the principal for a fiduciary's breach if either: (1) the check is payable to a personal creditor of the fiduciary and delivered to the creditor to pay or secure the fiduciary's personal debt to the actual knowledge of the creditor, or (2) the check is drawn and delivered in any transaction *known by the payee* to be for the personal benefit of the fiduciary.

*Id*. at 409 (quoting *Chouteau Auto Mart, Inc. v. First Bank of Mo.*, 55 S.W.3d 358, 360 (Mo. 2001) (en banc)). Thus, in order to hold the bank liable, § 469.270 requires proof that the Bank have "actual knowledge that it was applying the proceeds to a debt owed the Bank," *DeLaRosa v. Farmers State Bank S/B*, 474 S.W.3d 240, 245 (Mo. Ct. App. 2015), or "must know that [the fiduciary] is using the fiduciary funds for [his] personal benefit," *Aguilar*, 853 F.3d at 409 (alterations in original) (quoting *Chouteau*, 55 S.W.3d at 360–61). On this record, the plaintiffs fail to establish either actual knowledge or bad faith.

### 1. *Actual Knowledge*

The plaintiffs argue that numerous e-mails between Sigillito and Hingle and Ohlms prove Hingle's and Ohlms's knowledge that Sigillito was misappropriating fiduciary funds in the IOLTA to pay off his line of credit at St. Louis Bank. For Hingle and Ohlms to have actual knowledge of Sigillito's breach of his fiduciary duty, they must have had an "awareness that, at the moment, the fiduciary was defrauding the principal." *Aguilar*, 853 F.3d at 407 (quotations omitted). They must have possessed "express factual information" that Sigillito was using the fiduciary funds "for private purposes in violation of the fiduciary relationship." *Id*. (quotations

-7-

omitted). St. Louis Bank cannot be found to have "actual knowledge of a breach of trust merely because at some stage of the handling of the fiduciary account it could, by inspection of public records or by piecing together all the facts known by different employees of the bank, become aware of a breach of trust." *Id*. (quotations omitted).

Having reviewed the record, we agree with the district court that "nothing in the e-mails [offered by the plaintiffs] evidences any understanding with respect to the fiduciary status of the funds being discussed or any possible misappropriation of Plaintiffs' funds." These e-mails and other record evidence show Sigillito moving large sums of money between his IOLTA, Business Account, and MTSA Loans. But, as the district court recognized, none of this "evidence show[s] that St. Louis Bank had a duty to investigate these transactions, or that St. Louis Bank's employees should have been on notice that Sigillito was misusing funds [from the IOLTA]."

The multiple-source nature of the IOLTA precluded St. Louis Bank and its employees from knowing whether transactions in the account involved fiduciary funds. As we recognized in *Aguilar*, "[t]he funds held in a Missouri IOLTA . . . may contain a variety of funds, including individual client funds, multiple client funds, *and attorney's fees*." 853 F.3d at 397 (emphasis added).[3] In the present case, St. Louis

---

[3]The 2006 and 2007 versions of the Missouri Supreme Court Rules are the same as that set forth in *Aguilar*, 853 F.3d at 397 n.5. The 2008, 2009, and 2010 versions provide that "[a] lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred." Mo. Sup. Ct. R. 4-1.15(e) (2008, 2009, 2010); *see also* Mo. Sup. Ct. R. 4-1.15 cmt. 3 (2008, 2009, 2010) ("Lawyers often receive funds from which the lawyer's fee will be paid. The lawyer is not required to remit to the client funds that the lawyer reasonably believes represent fees owed. However, a lawyer may not hold funds to coerce a client into accepting the lawyer's contention. The disputed portion of the funds must be kept in a trust account, and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration. The undisputed portion of the funds shall be promptly distributed.").

Bank offered *unrebutted* expert testimony from certified public accountant Joseph Hopkins that an IOLTA includes "[r]etainer fees paid to lawyers by clients which become attorneys' fees as legal work is performed"; "[j]udgments or settlements paid that will be split between the lawyer and client at a later date"; "[p]ayments from third parties for other activity such as investments to be made by the lawyer on behalf of the client whereby the lawyer will earn a fee"; and "[r]eimbursement by clients and non-clients for expenses incurred by the lawyer." Hopkins identified as a "common scenario" an IOLTA "hold[ing] funds paid by the client up front as an advance on fees and expenses before the work is done and prior to the client's approval of billing." Consistent with *Aguilar*, Hopkins explained that funds in an IOLTA "may be owed to the beneficiaries of the trust, *the attorney involved* and unrelated third parties."

The plaintiffs argue that Hopkins's conclusory statement that "[t]he funds in the account may be owed to . . . the attorney involved" ignores the fact that client funds in an IOLTA that are paid as an advance on fees remain client property until the fees are earned; once those fees are earned, the lawyer must remove his fees from the IOLTA. In his report, Hopkins *did* recognize that "[o]nce the lawyer earns the fees and bills the client, and upon the client's approval of the lawyer's billing, the funds are no longer property of the client and should be removed from the lawyer's [IOLTA]." The plaintiffs have not provided evidence that any funds that Sigillito *removed* from the IOLTA were not properly earned fees or funds that he was otherwise authorized to remove.

Furthermore, other undisputed evidence shows that St. Louis Bank's *understanding* of the IOLTA—even if mistaken—was that an IOLTA may consist of money belonging to the lawyer. *See Aguilar*, 853 F.3d at 407 ("Neither party disputes that '[i]n 2001, Allegiant Bank's understanding of the nature and function of IOLTA

accounts was that . . . an IOLTA account can be funds for an individual client, multiple clients, and could include funds that belong to the lawyer, themselves.'" (ellipsis and alteration in original)). For example, Kimberli Palmer, Executive Vice President and Chief Operations Officer of St. Louis Bank, declared that

> unlike a typical trust account in which the Bank might know the identity of specific beneficiaries, an IOLTA Account can contain funds of multiple and ever-changing beneficiaries, as well as third party funds and fees earned by the attorney. The Bank did not have Sigillito's detailed records concerning IOLTA funds, and did not know whether a given transaction was authorized or not.

The undisputed evidence also shows that St. Louis Bank's employees lacked actual knowledge of Sigillito's breach of fiduciary duty. The evidence shows that Hingle did not know whether money in Sigillito's IOLTA account was received from investors, law clients, or others, and had no way of knowing the source of the funds. Likewise, Ohlms had no understanding of Sigillito's law practice and lacked knowledge of the parties involved in the various transactions, reasons for the transfers, or whether the money belonged to Sigillito. And Stajduhar, Sigillito's assistant, testified that (1) St. Louis Bank was given no information concerning the BLP; (2) Stajduhar and Sigillito would contact Ohlms to handle transactions, but Stajduhar never explained why they were made or whether they pertained to the BLP; (3) Stajduhar never saw any documents about the BLP that were sent to St. Louis Bank; (4) Stajduhar never gave St. Louis Bank any breakdown of the process, loan agreements, spreadsheets, or instructions showing how investors' money was being used; and (5) Stajduhar never saw anything indicating that St. Louis Bank had knowledge of what was happening with the BLP.

As a result, we hold that the plaintiffs have failed to show that St. Louis Bank had actual knowledge that Sigillito misappropriated fiduciary funds.

-10-

## 2. *Bad Faith*

The plaintiffs argue that they proved that St. Louis Bank acted in bad faith when it "covered up" "two material overdrafts in the IOLTA." The first overdraft occurred on April 20, 2009, when the IOLTA was overdrawn in the amount of $249,032.46. Sigillito addressed the deficiency by directing St. Louis Bank to transfer $288,200.25 from the Business Account into the IOLTA, thereby resolving the overdraft. The second overdraft occurred on May 20, 2009, when Sigillito wired $141,000 from the IOLTA to the British American Group. This wire created an overdraft in the IOLTA of $143,839.12. Also on May 20, 2009, Hingle signed the check disbursing $150,000 from the 4382 Loan with check no. 3424.

The plaintiffs argue that "Sigillito's $249,032 and $143,839 overdraft[s] of his IOLTA put St. Louis Bank on notice that Sigillito was misappropriating client funds. St. Louis Bank even advanced funds from its line of credit to cover the overdraft." They assert that "[a] check on a client account that is dishonored for insufficient funds is often evidence that a lawyer has improperly commingled client funds, in violation of his or her fiduciary duties." (Quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 280 (2d Cir. 2006).) They maintain that "IOLTA overdrafts are 'indicative of trust withdrawals for nontrust purposes.'" (Quoting *Lerner*, 459 F.3d at 288.)

> "The test of bad faith is 'whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is "bad faith" to remain passive.'" [*Watson Coatings, Inc. v. Am. Express Travel Related Servs., Inc.*, 436 F.3d 1036, 1041 (8th Cir. 2006)] (quoting *Trenton* [*Tr. Co. v. W. Sur. Co.*], 599 S.W.2d [481,] 492 [(Mo. 1980 (en banc)]). For a bank to act in bad faith, "[t]he facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." *Hendren* [*v. Farmers State Bank, S.B.*], 272 S.W.3d [345,] 350 [(Mo. Ct. App. 2008)] (quoting *Gen. Ins.*

*Co. of Am.* [*v. Commerce Bank of St. Charles*], 505 S.W.2d [454,] 458 [(Mo. Ct. App. 1974)]).

*Aguilar*, 853 F.3d at 408 (fifth alteration in original).

In *Buffets, Inc. v. Leischow*, we concluded that a bank's toleration of a severe practice of overdrafts or significant evidence of check kiting amounts to bad faith (as opposed to actual knowledge) under the Uniform Fiduciaries Act[4] only when the bank knows either a designated fiduciary account or a segregated account contains the principal's funds. 732 F.3d 889, 900–01 (8th Cir. 2013).We explained:

> Where funds are held in a fiduciary account and the bank is thus aware that they do not belong to the fiduciary, the nature of the account necessarily puts the bank on notice of fiduciary obligations. So it follows that the fiduciary's suspicious banking practices alone can indicate a violation of those obligations and the bank's bad faith. Where funds are held in the fiduciary's *personal* account, by contrast, overdrafts and check kiting do not necessarily implicate a fiduciary duty. The bank may be unaware that any funds are held subject to a fiduciary obligation. *Even if the bank knows that fiduciary obligations apply to some funds in the account, overdrafts and check kiting may not involve those specific funds, so the bank may not be acting in bad faith in processing any particular transaction.*
>
> Given this distinction, . . . a bank's toleration of "a severe practice of overdrafts or significant evidence of check kiting" by itself amounts to bad faith only in the context of either a designated fiduciary account or a segregated account that the bank knows contains the principal's funds.

---

[4]"The UFL is the Missouri codification of the Uniform Fiduciaries Act . . . ." *Aguilar*, 853 F.3d at 405 (quotations omitted). *Buffets* involved Minnesota's Uniform Fiduciaries Act. 732 F.3d at 898.

*Id*. (second emphasis added) (quoting *McCartney v. Richfield Bank & Tr. Co.*, Nos. CX–00–1466, C1–00–1467, 2001 WL 436154, at *4 (Minn. Ct. App. May 1, 2001)).

Here, the IOLTA is a fiduciary account. But as Hopkins's unrebutted expert testimony shows, an IOLTA is a "demand deposit" account, different from a typical trust account. A trust account at a bank is "an account whereby the trust department of a bank . . . is the trustee of the account and has primary fiduciary responsibility to an individual or limited group of individuals . . . who are the beneficiaries of such a trust." Funds in an IOLTA, however, "may be owed to the beneficiaries of the trust, the attorney involved and unrelated third parties." Hopkins stated that "the activity in the IOLTA comports with the activity you would anticipate seeing with an attorney." Finally, Hopkins stated that there was no activity in or patterns that led him to believe that St. Louis Bank, "acting in a commercially reasonable banking manner, should have known" that Sigillito was misappropriating client funds.

Because an IOLTA is not a typical trust account and may involve a variety of funds—some of which are attorney's fees that the attorney withdraws when earned—even if St. Louis Bank knew that Sigillito had fiduciary obligations as to "some funds in the account, overdrafts and check kiting may not involve those specific funds, so the bank may not be acting in bad faith in processing any particular transaction." *Buffets*, 732 F.3d at 901.

And, the undisputed facts show St. Louis Bank's *belief* that "unlike a typical trust account in which the Bank might know the identity of specific beneficiaries, an IOLTA Account can contain funds of multiple and ever-changing beneficiaries, as well as third party funds and fees earned by the attorney."

Finally, in uncontroverted testimony, Palmer explained that the overdrafts were caused by Sigillito's mistakes involving transfers to or from the wrong accounts, or the timing of the transfers. Both overdrafts were corrected by transfers using funds

-13-

already available *prior to* the overdrafts. And Hingle stated that the increase to the MTSA Loans was discussed with Sigillito on March 27, 2009, well before the April 20 overdraft, and it was authorized on May 18, prior to the May 20 overdraft.

Accordingly, we conclude that the plaintiffs have failed to prove that St. Louis Bank acted in bad faith.

### 3. *Personal Benefit*

The plaintiffs also argue that St. Louis Bank is liable under the UFL because it knew that Sigillito was "using the fiduciary funds for [his] personal benefit." *Chouteau*, 55 S.W.3d at 360–61. Before the district court, the plaintiffs argued that Sigillito held personal debts at St. Louis Bank in the form of the 4316 Loan and the 4382 Loan (MTSA lines-of-credit loans) and, therefore, St. Louis Bank is strictly liable for payments on these loans. The plaintiffs noted that Sigillito was a personal guarantor of the 4316 Loan and the 4382 Loan and argued that "[a]s guarantor of these loans, the debt owed to St. Louis Bank was a personal debt of Sigillito."

St. Louis Bank correctly points out that, on appeal, the plaintiffs have "abandon[ed] their arguments about the MTSA loans, only to make similar claims about repayments of a loan to Rosemann." Specifically, the plaintiffs argue that Sigillito pledged his collateral for Rosemann's $600,000 line-of-credit loan; the collateral for this line of credit "was the assignment of the CDARS account of MTSA in the amount of $327,556 and the CDARS account of Martin T. Sigillito in the amount of $280,224." They argue that Sigillito personally benefitted from the repayment of Rosemann's loan "by having his collateral returned to him."

We agree with St. Louis Bank that the plaintiffs have failed to provide any legal authority that repayments of debts guaranteed by a fiduciary are for the fiduciary's "personal benefit." This is not a case in which Rosemann defaulted on the loan, thereby resulting in him being personally liable for the debt on the guarantor.

-14-

*Cf. Enter. Bank & Tr. v. Barney Ashner Homes, Inc.*, 300 P.3d 115 (Kan. Ct. App. 2013) (memorandum opinion) (liability following default on loan).

The plaintiffs also argue that St. Louis Bank is liable for accepting fiduciary funds from Sigillito's IOLTA to repay his corporate loan. They maintain that St. Louis Bank benefitted from this repayment. According to the plaintiffs, "[s]hortly after accepting direct payments for Rosemann, St. Louis Bank on May 19, 2008, accepted a check for $175,053.47 'as payee and drawee bank' and applied [that amount] 'to pay off the MTSA line of credit, loan number 431600.'" But these MTSA loans were not personal debts of Sigillito's. Stajduhar testified that the MTSA Loans were not loans to Sigillito personally, and she knew of no payments on a personal loan or personal debt of Sigillito from the IOLTA. Both Palmer and Hingle testified that St. Louis Bank's loans were made to MTSA and were not personal loans to Sigillito and were not reported on his personal credit bureau report because they were not personal loans. Palmer testified that Sigillito had no personal debt owed to St. Louis Bank and that St. Louis Bank had no knowledge of any payment by Sigillito of a personal debt. She also testified that although Sigillito and his wife gave St. Louis Bank Commercial Guaranties on MTSA Loans, they were not a personal debt of Sigillito and were not classified as such by St. Louis Bank. As the district court stated, the evidence in the record demonstrates that the 4316 Loan and the 4382 Loan were commercial loans made to Martin T. Sigillito & Associates and were never classified as personal loans.

As a result, we conclude that the plaintiffs have failed to show that St. Louis Bank knew that Sigillito was "using the fiduciary funds for [his] personal benefit." *Chouteau*, 55 S.W.3d at 360–61.

We hold that the district court properly denied summary judgment to the plaintiffs on their UFL claim and granted summary judgment to St. Louis Bank on that claim.

B. *Counts II, III, and IV—Common-law Claims and RICO Claim*

The plaintiffs argue that the district court erred in granting summary judgment to St. Louis Bank on the common-law claims set forth in Counts II and III: aiding and abetting breach of fiduciary duty and conspiracy to breach fiduciary duty. They also assert that the district court erred in granting summary judgment to St. Louis Bank on their claim that St. Louis Bank conspired with Sigillito to violate RICO.

Under Missouri law,[5] to prove that St. Louis Bank aided and abetted Sigillito in the breach of his fiduciary duty, the plaintiffs must establish that St. Louis Bank "*kne[w]* that [Sigillito's] conduct constitute[d] a breach of duty and g[ave] *substantial assistance or encouragement* to [Sigillito] so to conduct himself." *Aguilar*, 853 F.3d at 403 (first and fourth alterations in original) (quoting *Bradley v. Ray*, 904 S.W.2d 302, 315 (Mo. Ct. App. 1995)). The plaintiffs must show that St. Louis Bank "affirmatively act[ed] to aid [Sigillito]." *Id.* (first alteration in original) (quoting *Bradley*, 904 S.W.2d at 315). St. Louis Bank is not liable for a mere "failure to object to the tortious act [or its] mere presence at the commission of the tort." *Id.* (quoting *Bradley*, 904 S.W.2d at 315). "[M]ere negative acquiescence" is insufficient to hold St. Louis Bank liable; instead, it must have "associate[d] [itself] in some way with [Sigillito] in bringing about the commission of the crime." *Id.* (second alteration in original) (quoting *Bradley*, 904 S.W.2d at 315).

To prove that St. Louis Bank conspired with Sigillito to breach his fiduciary duties, the plaintiffs "must prove the elements of civil conspiracy." *Id.* at 402. Those elements include:

> (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) resulting damages. The essence of a civil conspiracy is an *unlawful* act agreed upon by two or more persons.

---

[5]The parties agree that Missouri law applies to the common-law claims.

-16-

*Id*. at 402–03 (quoting *Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996)). The third element requires the plaintiffs to prove "that any two of the Defendants involved in the alleged civil conspiracy met, negotiated, and more importantly, achieved a meeting of the minds to carry out some unlawful purpose." *Id*. at 403 (quoting *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 204–05 (Mo. Ct. App. 2006)). To prove that St. Louis Bank and Sigillito had a "meeting of the minds," the plaintiffs must show that the parties had "a unity of purpose or a common design and understanding." *Id*. (quoting *Glob. Control Sys., Inc. v. Luebbert*, No. 4:14-CV-657-DGK, 2016 WL 910190, at *2 (W.D. Mo. Mar. 9, 2016)).

To prove that St. Louis Bank conspired with Sigillito to violate RICO, the plaintiffs must not only prove the elements of a RICO violation but also that St. Louis Bank "objectively manifested an agreement to participate . . . in the affairs of [the] enterprise." *Id*. at 402 (ellipsis and alteration in original) (quoting *United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995)). Proving that St. Louis Bank merely associated with Sigillito, knew about the conspiracy, and was present during conspiratorial discussions is insufficient to show that St. Louis Bank conspired with Sigillito to violate RICO. *Id*. Instead, the plaintiffs must produce evidence that St. Louis Bank "was aware of the scope of the enterprise and intended to participate in it." *Id*. (quoting *United States v. Stephens*, 46 F.3d 587, 592 (7th Cir. 1995)).

The plaintiffs argue that St. Louis Bank's handling of the overdrafts in the IOLTA proves that it knew that Sigillito was breaching his fiduciary duty. They also reference several e-mails to prove that St. Louis Bank, as payee and drawee bank, accepted millions in fiduciary funds for payment of principal and interest on Sigillito's personal line of credit. They contend that they have proven a common-law conspiracy and conspiracy to violate RICO by producing evidence that Sigillito used the IOLTA to pay personal expenses and loans with St. Louis Bank.

-17-

We conclude that the plaintiffs' common-law and RICO claims fail because their evidence does not create any genuine issues of material fact. We have already held that the evidence of overdrafts and e-mails is insufficient to prove St. Louis Bank's actual knowledge under the UFL. *See supra* Part II.A.1. For the same reasons, such evidence is insufficient to prove that St. Louis Bank knew that Sigillito's conduct constituted a breach of his fiduciary duty, had a meeting of the minds with Sigillito to breach his fiduciary duty, or objectively manifested an agreement to participate in criminal activity with Sigillito. This reasoning extends to the plaintiffs' contention that St. Louis Bank "knew that Sigillito was prohibited from using funds in his IOLTA . . . to pay his personal debts." Even assuming Sigillito was using IOLTA funds to pay personal debts, the plaintiffs have failed to produce evidence that the funds were not properly earned fees or funds that he was otherwise authorized to remove from the account. *See supra* Part II.A.1. This is because an IOLTA is a unique trust account that may involve a variety of funds, some of which are attorney's fees that the attorney withdraws when earned. *See supra* Part II.A.1.

As a result, we hold that the district court properly granted summary judgment to St. Louis Bank on Counts II, III, and IV.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____