# United States Court of Appeals
## For the Eighth Circuit
_____

No. 22-3331
_____

UMB Bank, N.A.

*Plaintiff - Appellant*

v.

Richard Guerin, as personal representative for the estate of Jessie Benton, et al

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: September 20, 2023
Filed: January 4, 2024
_____

Before LOKEN, WOLLMAN, and BENTON, Circuit Judges.
_____

LOKEN, Circuit Judge.

Famous American Regionalist artist Thomas Hart Benton and his wife passed away in 1975, leaving behind a family trust (the "Trust") that included hundreds of works of art by Thomas Hart Benton, real estate, and various personal effects. The primary Trust beneficiary is their daughter Jessie Benton (to avoid confusion, hereafter referred to as "Jessie"). Her three children are discretionary beneficiaries. The Trust was jointly administered by UMB Bank, N.A. ("UMB") and a Benton

family friend until 1999, when UMB became the sole trustee. UMB resigned in 2019 after the beneficiaries sued UMB in Missouri state court alleging Trust mismanagement (the "Probate case"). UMB subsequently filed this complaint in federal court alleging that Jessie and her children ("Defendants") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, by committing related acts constituting mail, wire, and bank fraud.

On June 6, 2022, with the Probate case ongoing in state court, the district court[1] dismissed UMB's First Amended Complaint ("FAC") for failure to state a civil RICO claim. Almost a month later, UMB moved to vacate, alter, or amend the judgment and for leave to file a Second Amended Complaint ("SAC"). On October 19, the district court denied those motions, concluding the proposed SAC would unduly prejudice Defendants and was futile because it "still fail[ed] to plead a proper civil RICO claim." UMB appeals both orders.

We review the grant of a motion to dismiss *de novo*, affirming "if the complaint fails to allege facts sufficient to state a claim to relief that is plausible on its face.'" Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (quotation omitted). We take as true the facts alleged in the complaint, but not the legal conclusions. Id. at 350 n.3. "[A]llegations of fraud . . . [must] be pleaded with particularity. In other words, [Federal] Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." Id. at 353 (quotation omitted). Conducting our review in accordance with these standards, we affirm.

---

[1]The Honorable Beth Phillips, Chief Judge of the United States District Court for the Western District of Missouri.

# I. Background

The FAC alleges that, between 1980 and 2019, UMB periodically sold some works of art owned by the illiquid Trust. Proceeds were reinvested or distributed to or for the benefit of the Defendants. The defendant beneficiaries are also members of the Lyman Family, the FAC alleges, a communal family of over forty adults. "Jessie took over" the Lyman Family in 2018 and greatly supported the aging family members by distributions from the Trust and by allowing use of Trust property for communes. The "'graying' of the Lyman Family" and the Defendants' own increasing financial demands created a "financial crisis" for the Lyman Family, which is alleged to be the RICO enterprise.

In late 2014, Jessie asked the Trust to sell more art to meet the increasing financial needs of the beneficiaries and the Lyman Family, requests that increased between 2014 and 2018. Jesse told UMB it should respond to demands from a lawyer for the beneficiaries, Andre Boyda, for "decades of information" about the Trust and UMB's actions as trustee. The FAC alleges that "Defendants charged Andre Boyda with scouring UMB's files to find anything Defendants could use to bring public pressure on UMB to pay money to Defendants that they could use to address their increasing financial demands . . . and/or to allow Defendants to force UMB to resign as trustee of the Trust."

Based on information Boyda gathered, he and Defendants compiled a list of grievances related to UMB's management of the Trust and put together media talking points about UMB's mismanagement. Communication between Defendants and Boyda largely occurred over text, email, and phone calls. These grievances formed the basis for the Probate case Defendants filed in December 2019 alleging that "UMB failed to marshal and probate all assets" of the Trust; failed to maintain complete records of Trust property; failed to get valid appraisals resulting in inadequate insurance coverage and sales of Trust property below market value; lost Trust

property; and engaged in self-dealing and promotion. Defendants further alleged that "UMB's lack of adequate preservation and storage . . . damaged the artwork and property" of the Trust; "UMB failed to maximize revenue through promoting, copyrighting, and licensing artwork;" and "UMB failed to prudently invest assets . . . thereby causing significant economic loss to the [Trust]." Defendants sought UMB's removal as trustee and damages totaling $300 million.

Also in December 2019, the FAC alleges, Defendants and their attorney discussed their allegations with the media. Jessie spoke by phone with the Wall Street Journal about UMB's Trust management. The Journal published an article on December 18 quoting Jessie as saying that UMB failed to notify the family before selling Trust art and failed to get updated appraisals of art in the Trust. Boyda gave statements to two separate media outlets, KCUR and the Kansas City Star. Both published pieces on December 19 quoting Boyda's statements largely reiterating the allegations in the Probate case petition. Neither Defendants nor their attorneys conducted additional interviews but these interviews were quoted in other outlets.

In March 2021, UMB filed a voluntary statement with the state probate court stating that "UMB wishes to resign as [] Trustee." The state probate court conducted a bench trial in July 2023. The Probate case is still pending.

UMB in the FAC alleges that all of Defendants' allegations in the Probate case are false, and that Defendants made the allegations in the Probate case petition and reiterated them to the media knowing them to be false. Defendants' inquiries into Trust administration, filing of the Probate case, and communications with the media are part of a years-long campaign "to bring public pressure on UMB to pay money to Defendants that they could use to address their increasing financial demands and those of the Lyman Family without liquidating additional portions of the corpus of the Trust or their individual art assets and/or to allow Defendants to force UMB to resign as trustee of the Trust." UMB alleges that in perpetrating this scheme,

-4-

Defendants have violated RICO with racketeering activity including acts of mail, wire, and bank fraud. Count I alleges that all of this conduct qualifies as mail and wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343 and Count II alleges the same conduct also qualifies as bank fraud under 18 U.S.C. § 1344 because UMB is a federally insured bank.

## II. Discussion

**A. The Governing Law.** "Enacted to strengthen criminal and civil remedies against organized crime, RICO provides a private right of action for any person 'injured in his business or property by reason of a violation of' its substantive provisions. 18 U.S.C. § 1964(c). The prohibition at issue is 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Dahlgren v. First Nat. Bank of Holdrege, 533 F.3d 681, 689 (8th Cir. 2008), cert. denied, 555 U.S. 1153 (2009).

"A violation of § 1962(c) requires [UMB] to show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Crest, 660 F.3d at 353 (quotation omitted). "Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails." Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1028 (8th Cir. 2008) (citation omitted). A civil RICO plaintiff must show injury "by reason of" a RICO violation, that is, injury "both factually and proximately caused" by the violation. Regions Bank v. J.R. Oil Co. LLC, 387 F.3d 721, 728 (8th Cir. 2004) (quotation omitted). This showing "requires

-5-

proof of concrete financial loss, and not mere injury to a valuable intangible property interest." Id. (quotation omitted). These requirements are not easily met.

"Racketeering activity" consists of the commission of a predicate act, as defined in 18 U.S.C. § 1961(1). See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 (1985). Racketeering as defined includes conduct which is indictable as mail, wire, or bank fraud under 18 U.S.C. §§ 1341, 1343, and 1344. "When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." Wisdom v. First Midwest Bank, of Poplar Bluff, 167 F.3d 402, 406 (8th Cir. 1999). Mail and wire communications "are insufficient to establish the [RICO] continuity factor unless they contain misrepresentations themselves." Id. at 407. A pattern of racketeering activity "requires at least two acts of racketeering activity." § 1961(5).

**B. The Alleged Acts of Racketeering Activity.** In the dismissal Order, the district court read UMB's 58-page FAC as alleging that Defendants committed four related predicate acts that constitute mail, wire, and bank fraud and establish a pattern of racketeering activity: (1) instructing their attorney to collect records about UMB's actions as trustee for the purpose of ousting UMB from that position; (2) knowingly communicating false claims about UMB's behavior among themselves and with their attorney; (3) communicating the substance of their allegations to the media in December 2019; and (4) filing and prosecuting a Probate case that knowingly advanced false allegations against UMB.

(1) The district court concluded that Defendants telling their attorney to look into UMB's actions as trustee cannot constitute mail or wire fraud because "an instruction is not a representation." UMB argues the court "mischaracterized" its claim because the FAC "alleges that the communications between these wrongdoers were about trumping up false claims that could be used to pressure UMB to resign as

-6-

trustee." However, the cited paragraphs of the FAC allege that Defendants instructed attorney Boyda to demand "decades of information and records from UMB" *and then* they "resorted to mail, wire and bank fraud to garner the necessary public pressure [to] force UMB to pay them millions of dollars . . . and/or force UMB to resign as trustee."

Viewed in perspective, trust beneficiaries instructing their attorney to collect trust records was not fraud, and it preceded any fraud that allegedly occurred after the Trust records were obtained. Defendants, the Trust's beneficiaries, wanted the trustee to meet their financial needs; the trustee refused repeated requests for increased distributions. The Trust settlor was dead and UMB, the sole trustee, would not exercise its discretion to heed their requests. So the beneficiaries told their attorney to gather information about UMB's management of the Trust, which might yield information that could bring public pressure to bear on the trustee, or even provide a basis to petition the probate court to remove the trustee because of Trust mismanagement.[2] One can view this as playing nasty trusts and estates hardball, but it was not mail, wire, or bank fraud. "We have . . . rejected attempts to convert ordinary civil disputes into RICO cases." Craig, 528 F.3d at 1029 (citation omitted).

(2) The district court concluded that the FAC failed to allege the fraudulent communications among Defendants and their attorney with particularity or show that these communications meet the elements of mail, wire, or bank fraud. In general, "the Court does not believe that communications from a client to her attorney can constitute fraud -- otherwise, any criminal defendant who said 'it wasn't me' to her attorney might be liable for mail fraud." On appeal, UMB argues the court "removed the allegations from their context" and the court's "blanket exemption of litigation

---

[2]Section 456.8-813.1(2) of the Revised Statutes of Missouri provides: "Unless unreasonable under the circumstances, a trustee shall promptly respond to a beneficiary's request for information related to the administration of the trust."

activities from the mail and wire fraud statutes erroneously ignores the text of those statutes." We disagree.

Many courts have considered whether pre-litigation activity can be a predicate for a civil RICO claim. Most have concluded "that various actions in litigation could be the substance of malicious prosecution torts but could not sustain RICO liability." Snow Ingredients, Inc. v. SnoWizard, Inc., 833 F.3d 512, 525 (5th Cir. 2016).

We considered this question in a closely related context. In I.S. Joseph Company, Inc. v. J. Lauritzen A/S, we affirmed the dismissal of a RICO claim by a shipper who alleged that defendants committed the predicate act of extortion when they threatened to sue the shipper's bank "for the purpose of terrorizing and intimidating [the shipper] into meeting [their] demands" to pay an outstanding debt. 751 F.2d 265, 266 (8th Cir. 1984). We concluded that, even if the threat to sue was groundless and made in bad faith, it did not meet the elements of the federal crime of extortion. "If a suit is groundless or filed in bad faith, the law of torts may provide a remedy. Resort to a federal criminal statute is unnecessary." Id. at 267-68.

The same reasoning applies to communications between Defendants and their attorney about whether to pressure a trustee to increase distributions, even if the communications ended in an allegedly groundless suit for Trust mismanagement. This is not a "blanket exemption of litigation activities" from the mail, wire, and bank fraud statutes. Because UMB does not allege -- certainly not with particularity -- that any criminal activity tainted these private attorney-client communications over how to pressure UMB into being more responsive to the beneficiaries' requests, that activity cannot be conduct forming a predicate act of fraud under RICO.

(3) The district court concluded that Defendants' communications with three media outlets in December 2019 "might qualify as predicate acts" of mail, wire, or

-8-

bank fraud.[3] Though the question is not free from doubt, we are inclined to agree. In any event, Defendants do not cross appeal this ruling.

The FAC alleges that Defendants knowingly made false statements to the media. These allegations almost certainly state a claim for defamation under state law. But the FAC further alleges that statements in the Wall Street Journal, KCUR, and Kansas City Star interviews were made in furtherance of Defendants' overall scheme to "pressure, harass, embarrass and injure UMB through fraudulent statements and claims to force UMB to pay millions of dollars to Defendants so that they could avoid having to liquidate Trust assets to support their financial demands." If accompanied by sufficient allegations of a pattern of racketeering activity, these statements might qualify as predicate acts of mail, wire, or bank fraud.

(4) The district court concluded that communications by Defendants and their attorney made in the course of prosecuting the Probate case cannot form the basis for RICO predicate acts. On appeal, UMB argues the court's "blanket exemption of litigation activities" ignores the text of the mail and wire fraud statutes, which prohibit the mailing of "any matter or thing" and the transmission of "any writings, [etc.]," and fails to "properly analyze . . . the contextual allegations of Defendants' improper public media blitz coupled with the subsequent false statements made in [the Probate case]." UMB cites no RICO case supporting its conclusory statutory argument, and no specific "contextual allegations" in the FAC supporting its conclusory failure-to-analyze argument.

---

[3]Like the district court, we consider only the Wall Street Journal, KCUR, and Kansas City Star communications, not the other news articles UMB attached to the FAC, because "independent media outlets [that picked up the story] are not agents of Defendants, and so their behavior is not a predicate act attributable to Defendants," citing Craig, 528 F.3d at 1027.

"[I]n the absence of corruption . . . allegations of frivolous, fraudulent, or baseless litigation activities -- without more -- cannot constitute a RICO predicate act." Kim v. Kimm, 884 F.3d 98, 104 (2d Cir. 2018) (collecting cases); accord Snow Ingredients, 833 F.3d at 525 ("In the absence of corruption . . . prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system.") (quotation omitted). As one court noted, to hold otherwise "would result in the inundation of federal courts with civil RICO actions that could potentially subsume all other state and federal litigation in an endless cycle where any victorious litigant immediately sues opponents for RICO violations." Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq., 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010).

Moreover, the RICO statute provides for private enforcement actions and treble damages, which can be threats that chill the right to petition the courts. See Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris, Inc., 196 F.3d 818, 826 (7th Cir. 1999) (Easterbrook, J.) (applying the antitrust Noerr-Pennington doctrine to RICO claims); Sosa v. DIRECTV, Inc., 437 F.3d 923, 933-42 (9th Cir. 2006) (same); I.S. Joseph Company, 751 F.2d at 267. Like our sister circuits in Kim and in Snow Ingredients, we are not holding that litigation activities can *never* serve as a RICO predicate, only that UMB's conclusory, unpersuasive assertions do not provide a reason not to apply the general rule in this case. See Black v. Ganieva, 619 F. Supp. 3d 309, 343-44 (S.D.N.Y. 2022).

**C. The Alleged Pattern of Racketeering Activity.** Having concluded that UMB might be able to prove that three communications to media outlets in December 2019 qualify as predicate acts of mail, wire, or bank fraud, the district court turned to another element of UMB's RICO claims, that Defendants conducted the enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). This term, not fully defined in § 1961(5), has spawned decades of conflicting judicial

interpretations, but the district court applied the governing standard for proving the requisite pattern in this circuit:

> "[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." Continuity in this context refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." To satisfy the RICO continuity element, therefore, a plaintiff must provide evidence of multiple predicate acts occurring over a substantial period of time (closed-end continuity) or evidence that the alleged predicate acts threaten to extend into the future (open-ended continuity).

Craig, 528 F.3d at 1028 (citations omitted), quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239, 241 (1989).

The district court concluded that, while clearly related, the three predicate acts of allegedly fraudulent media communications were not sufficient to show a pattern of racketeering activity. There was no closed-end continuity because this requires related acts continuing over a period of time lasting at least one year, and the media communications by Jessie and attorney Boyda occurred over the course of a few weeks. See Primary Care Invs., Seven, Inc. v. PHP Healthcare Corp., 986 F.2d 1208, 1215 (8th Cir. 1993) ("[T]he requirement . . . is not met when the predicate acts extend less than a year"); Wisdom, 167 F.3d at 407 (A "six-month period is too short."). There was no open-ended continuity because the media communications "pertained to a specific, non-replicable event: the filing of the Probate Case," and there are no allegations in the FAC that the enterprise -- the Lyman Family -- "routinely disseminates fraudulent statements to news outlets."

UMB challenges both of these rulings on appeal. As to closed-end continuity, UMB argues the district court "ignored the wide range of conduct spanning years that

makes up the bank fraud allegations." But that argument assumes that UMB's predicate act arguments that we rejected in Part II.B. have merit.[4] We agree with the district court that three predicate acts, spanning only a few days and targeting a single victim (UMB) is insufficient to show a plausible claim of a closed-end pattern of racketeering.

As to open-ended continuity, UMB argues that "the [P]robate case is ongoing, Defendants' actions against UMB are ongoing, and they refuse to correct their prior statements." In addition, the Lyman Family enterprise "is ongoing and continues its half-a-century tradition of criminal activity." As the district court noted, the alleged qualifying predicate acts -- fraudulent communications with the media -- "occurred in a discreet timeframe, and pertained to a specific, non-replicable event: the filing of the Probate case." "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." H.J. Inc., 492 U.S. at 240 (emphasis in original). Here, there is no apparent threat that the qualifying predicate acts will continue into the future -- UMB has voluntarily resigned as trustee. UMB has failed to show a plausible claim of open-ended continuity.

UMB's failure to plausibly allege a pattern of racketeering activity, an element of its RICO claim against each defendant, means that its entire claim fails, including

---

[4]In its separate discussion of the bank fraud allegations in Count II of the FAC, the district court expressly held that "the reasons why the [FAC] fails to state a RICO claim [in] Count I also apply to Count II." We agree and have upheld that ruling in Part II.B. Alternatively, applying Loughrin v. United States, 573 U.S. 351, 362 (2014), the district court granted the motion to dismiss Count II because the alleged fraud concerned UMB's position as trustee, not its status as a bank. Ignoring the primary holding, UMB devotes pages of its initial Brief to attacking this alternative ground. We need not and do not consider this issue of first impression, on which neither the parties nor the district court cited direct judicial or secondary authority.

the claim in Count III of the FAC that "Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), mail, wire and bank fraud, by participating in an enterprise engaged in a pattern of racketeering activity." See Craig, 528 F.3d at 1028. To successfully allege conspiracy to violate RICO under 18 U.S.C. § 1962(d), UMB must first "prove the elements of a RICO violation." Rosemann v. St. Louis Bank, 858 F.3d 488, 500 (8th Cir. 2017).

**D. Denial of UMB's Post-Judgment Motions.** In a lengthy Order, the district court denied UMB's motions to vacate, alter, or amend the judgment and for leave to file the SAC. UMB argues the district court erred in denying its motion for leave to file the SAC. "[D]istrict courts in this circuit have considerable discretion to deny a post-judgment motion for leave to amend because such motions are disfavored." United States ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 824 (8th Cir. 2009). Courts have repeatedly upheld denials of motions to amend a civil RICO complaint that has been dismissed for failure to state a claim. See H & Q Props., Inc. v. Doll, 793 F.3d 852, 857 (8th Cir. 2015); Crest, 660 F.3d at 358-59; Kim, 884 F.3d at 105-06.

UMB based its request for leave to amend on Federal Rule 15(a)(2), which provides that "the court should freely give leave [to amend] when justice so requires." However, the liberal amendment standard in Rule 15(a)(2) does not govern this issue. "When a party moves to amend a complaint after dismissal, a more restrictive standard reflecting interests of finality applies." Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC, 781 F.3d 1003, 1010 (8th Cir. 2015). "Leave to amend will be granted if it is consistent with the stringent standards governing the grant of Rule 59(e) and Rule 60(b) relief." United States v. Mask of Ka-Nefer-Nefer, 752

-13-

F.3d 737, 743 (8th Cir. 2014). Here, Rule 59(e) does not apply because UMB's motion was untimely.[5]

The district court nonetheless considered UMB's post-judgment request and concluded there are "compelling reasons" to deny it, including undue prejudice to Defendants because the SAC repeats the FAC's "great deal of scandalous, logically irrelevant material designed solely to cast spurious aspersions on Defendants," and "perhaps most importantly," the "proposed amendment is futile because the SAC still fails to plead a proper civil RICO claim." We agree. See H & Q Props., Inc., 793 F.3d at 857. Because the proposed SAC was both untimely and futile, there was no abuse of discretion.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed. All civil RICO claims asserted by UMB against Defendants, including Jessie's estate, individually or collectively, are dismissed with prejudice. We need not consider, and decline to consider, other issues addressed by the parties on appeal -- UMB's contention that the district court erred in alternatively dismissing the RICO claims for failure to show proximate causation; Defendants' claim that UMB lacks "RICO standing;" and the bank fraud issue noted in footnote 3.

_____

_____

[5]UMB complains that the district court ignored its "initial request" to amend, referring to a sentence at the end of its supplemental brief addressing Defendants' motion to dismiss: "Alternatively, if the Court is inclined to grant the motion on any of the grounds raised in the Order, UMB requests leave to file a second amended complaint." This "initial request" required no response because it did not include a proposed amended complaint, as W.D. Mo. Rule 15.1(a) requires, and therefore failed to "preserve the right to amend the complaint." Clayton v. White Hall Sch. Dist., 778 F.2d 457, 460 (8th Cir. 1985).